# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

**JENNIFER LYNN YARRINGTON,**

       **Plaintiff,**

**v.**                                                      **Civil Action No. 4:17cv33**

**NANCY A. BERRYHILL,**
*Acting Commissioner of*
*Social Security,*

       **Defendant.**

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Jennifer Lynn Yarrington seeks judicial review of the Commissioner of Social Security ("Commissioner")'s denial of her claim for disability insurance benefits ("DIB") and supplemental Social Security income ("SSI"). Specifically, Yarrington claims that the Administrative Law Judge ("ALJ"), when determining her residual functional capacity ("RFC"), improperly weighed the opinions of Yarrington's treating physician and two state consultative experts and also erred in assessing Yarrington's credibility. Yarrington claims correcting these alleged errors could result in her being found disabled and therefore seeks remand of her claim.

This action was referred to the undersigned United States Magistrate Judge pursuant to provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the court AFFIRM the final decision of the Commissioner by GRANTING the Commissioner's Motion for Summary Judgment (ECF No. 12) and DENYING Yarrington's Motion for Summary Judgment (ECF No. 9) and Motion for Remand (ECF No. 10).

## I.      PROCEDURAL BACKGROUND

Yarrington filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") in September 2012.  R. at 256.  She alleged a disability onset date of April 27, 2012.  Id.  The agency denied her application.  R. at 155.  It also denied her application on reconsideration.  R. at 167.  The Commissioner's administrative law judge held a hearing for Yarrington's claims on July 2, 2015.  R. at 69-90.  He held a supplemental hearing on January 21, 2016.  R. at 38-49.  In an opinion dated February 10, 2016, the ALJ found Yarrington was not disabled during the period of alleged disability and denied her claims for benefits.  R. at 20-31.  The Appeals Council denied Yarrington's request for review on February 7, 2017.  R. at 1.

Yarrington timely filed a Complaint (ECF No. 1) seeking review of the agency's decisions.  She then moved for summary judgment (ECF No. 9) and remand (ECF No. 10).  The Commissioner filed its cross Motion for Summary Judgment (ECF No. 12), and the matter is ripe to resolve.

## II.     FACTUAL BACKGROUND

Yarrington was born December 11, 1982.  R. at 271.  She was only 29 years old on her alleged disability onset date.  See R. at 256.  She completed high school.  R. at 75.  She had previous work as a restaurant cashier and retail sales associate.  R. at 85.

The relevant portions of Yarrington's medical history are summarized here, as are the portions of the administrative proceedings below relevant to her arguments in this court.

a.      History of Treatment and Evaluation for Migraines.

On January 31, 2012, Yarrington sought treatment at Tidewater Physicians Multispecialty Group ("Tidewater") for constant migraines over the previous week.  R. at 355.  She was prescribed Tramadol for pain and advised that other medications she was taking might have

"flared" her headaches. R. at 357. On May 4, 2012, she sought treatment at an emergency room for a migraine, complaining she had "sharp, severe" pain in her head and sensitivity to light and sound. R. at 422. She also complained of nausea and vomiting. Id. She was prescribed Fioricet and, by the time she was discharged, reported no pain. R. at 421, 426. During treatment in July of that year for asthma unrelated to her migraines, she reported no headache. R. at 444.

She sought emergency room treatment for her migraines twice more in October 2012. R. at 508, 531. On the second occasion, she was prescribed Percocet for her pain. R. at 531. On October 29, 2012, Yarrington underwent a CT scan, which revealed no abnormalities. R. at 548. At Tidewater on November 12, 2012, she reported that the medications she was taking for the migraines were relieving her symptoms. R. at 686.

On April 16, 2013, Yarrington went to the emergency room again for migraine headaches and vomiting. R. at 898. She was prescribed Vicodin and discharged. R. at 902. In August 2013, she sought treatment from Tidewater for severe migraine symptoms that were not being relieved by her medication or other treatment. R. at 706. The Tidewater doctor diagnosed her with "Common migraine with intractable migraine, so stated." R. at 708. She was prescribed Percocet and Phenergan. Id.

On September 5, 2013, she saw Dr. Albert Francis for her migraines. She told him her medication was offering no relief. She complained of consistent pain over the past several days. The doctor also noted that she had not seen a neurologist as she had been directed to do in October 2012. R. at 821. She was continued on Fioricet and directed to follow up as needed. R. at 820.

She returned to the emergency room on September 10 and October 22, 2013, complaining of migraine symptoms. R. at 966, 1106. On her September visit she was

discharged after her headache had resolved.  The attending physician noted no atypical features. He recommended symptomatic treatment and the scheduled follow up with a neurologist.  R. at 969.  In the records from her October treatment, Yarrington told her provider she comes to the emergency room when her migraine symptoms became severe and that "got it under control enough so she can be treated at home with her medications."  R. at 1106.

Yarrington also treated for headaches, as well as back pain and other issues with the chiropractor, Dr. Lawrence Svihla.  R. at 1005-08.  His letter dated October 8, 2013, summarized the history of her treatment from 2004 to 2013.  Dr. Svihla concluded that she was "not disabled for her neck or back issues," suggesting she may need periodic chiropractic care as her symptoms required.  R. at 1007.  In an "Impairment Questionnaire" dated February 6, 2014, Dr. Svihla recorded his opinion that Yarrington's symptoms would not increase in a competitive work environment and would not render her incapable of tolerating moderate work stress.  R. at 1095-97.  He felt Yarrington was a malingerer.  R. at 1096.  He wrote, "I do not believe this patient is disabled.  Working would be beneficial to this patient."  R. at 1097.

There was no documentation in the record before the ALJ that Yarrington received treatment for her migraines after October 2013.

b.      History of Mental Health Treatment and Evaluation.

On November 21, 2011, Yarrington reported to her physician at Tidewater that her anxiety was making it "somewhat difficult to meet home, work, or social obligations" and that "[t]he symptoms are aggravated by conflict or stress at home or work," namely her mother's severe illness.  R. at 363.  Nonetheless, her doctor reported, "No unusual anxiety or evidence of depression."  R. at 365.

On April 17, 2012, Yarrington sought treatment for depression at Hampton Mental Health Associates ("HMHA") after the death of her mother. R. at 570-71. Yarrington reported she could clean and do laundry and that she had been dating recently. See R. at 570. She reported working as a sales associate with plans to secure a second job to change her living arrangements. R. at 571. Her psychiatrist, Dr. Linda Sabonya, recorded her status as having a depressed and anxious mood but logical, goal-directed, relevant and sequential thought processes. R. at 572. Dr. Sabonya noted Yarrington demonstrated appropriate, attentive, cooperative, and relaxed behavior but also noted Yarrington's anxiety range as "Panic." Id. The psychiatrist prescribed Lamictal, but this resulted in no reported improvement. R. at 571, 573.

On September 17, 2012, Yarrington reported increased activity, including photography and dating. R. at 574. On November 5, 2012, she reported feeling more anxious because she felt she and a boyfriend were about to separate. Id. In March 2013, the psychiatrist observed Yarrington had decreased dysphoria and anxiety. R. at 579. In May of that year, Yarrington told the psychiatrist her medication regimen was more effective and that she was promoting her photography business. Id. In September 2013, Yarrington reported problems with her boyfriend, including threatening and demeaning language. See R. at 817. In January 2014, Dr. Sabonya reported Yarrington was responding well to medication. R. at 1033.

Yarrington was consistently noted to have normal attention, normal judgment; intact memory; logical thought processes; and no delusions, hallucinations, obsessions, compulsions, or thoughts of harming herself or others. See, e.g., R. at 572 (April 2012), 1034 (January 2014), 1031 (April 2014), 1030 (June 2014), 1028 (November 2014), R. at 1065 (April 2015), R. at 1179 (December 2015). She was also consistently diagnosed with only "mild/moderate" or

"moderate" anxiety and depression.  See, e.g., R. at 1033 (January 2014), 1031 (April 2014), 1029 (June 2014).

Yarrington was evaluated for disability by her treating psychiatrist, Dr. Linda Sabonya, on May 7, 2015, and again on November 16, 2015.  Dr. Sabonya assessed the impact of Yarrington's mental health using the "Mental Impairment Questionnaire" created by Yarrington's attorneys.  See R. at 1059-64, 1173-77.  Both times, Dr. Sabonya checked boxes to opine that Yarrington's mental health condition would interfere with her ability to work one third of an eight-hour day if she were assigned to tasks concerning one-to-two step instructions.  R. at 1062, 1175.  She also opined that Yarrington's mental health condition would prevent her entirely from completing an eight-hour day if she were assigned to tasks requiring adherence to detailed instructions.  R. at 1062, 1175.  Dr. Sabonya also noted her opinion that Yarrington would have to miss work more than three times per month due to her impairments or treatment. R. at 1063, 1177.  Dr. Sabonya noted, "She has a chronic illness that will have acute exacerbations.  She has not reached maximum benefit of treatment and medications. . . . Her medical problems are also ongoing and contribute to her disability."  R. at 1063; see also R. at 1077 (offering a similar opinion in the November 2015 evaluation).

On August 7, 2013, a state agency psychological consultant, Dr. Richard Luck, reviewed Yarrington's records and determined she was "not significantly limited" in remembering "very short and simple instructions."  R. at 108.  Although he found she was "moderately limited" in her ability to carry out detailed instructions and to maintain concentration for an extended period, he determined she was "not significantly limited" in her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  R. at 108.  On

November 22, 2013, another state agency psychological consultant, Dr. Donald Bruce, reviewed Yarrington's mental health records and reached the same conclusions.  R. at 131, 134-36.

c.     Testimony Before the Administrative Law Judge.

Yarrington testified before the ALJ at her hearing on July 2, 2015.  R. at 71.  Yarrington testified she had been "fired" from her last job in 2012 due to her having to "constantly call out" due to her migraines and bronchitis.  R. at 76.  She also told the ALJ she had severe headache symptoms and vomited "constantly" when her migraines developed.  R. at 75-78.  She also told the ALJ she had migraines approximately seven times per month lasting from an hour to a week each time.  R. at 78.  Regarding her mental health condition, she told the ALJ she has "anger outbursts" and that she will cry for no reason.  R. at 79-80.  She complained of panic attacks when around a group of people.  R. at 80-81.  She told the ALJ her medications "help some."  R. at 82.  During a supplemental hearing on January 21, 2016, Yarrington told the ALJ her condition had not changed since her last testimony.  R. at 44.

On January 21, 2016, the ALJ asked a vocational expert ("VE") to consider jobs available to a hypothetical person of Yarrington's age, education, and work background, but limited to sedentary work, with several detailed postural limitations.  The ALJ also limited the individual to simple, routine, low-stress tasks, defining low stress as involving minimal changes in routine, no production quotas and only occasional superficial interactions with co-workers or the public.  R. at 45-46.  The VE testified there were jobs available in the national economy such an individual could perform, identifying addresser (45,000 nationally), document preparer (41,000) and touch-up screener (90,000).  R. at 46.

The ALJ also asked the VE to consider a hypothetically limited individual who would miss work two or more days per month, or be off task two-thirds of a workday due to marked mental health limitations. Both limitations would preclude all work. R. at 47.

d.    The ALJ's Decision.

The ALJ issued his decision on February 10, 2016. R. at 31. He determined Yarrington last met the insured requirements for DIB on March 31, 2014, making this her date last insured ("DLI"). R. at 20. He determined that Yarrington had severe mental health impairments and migraines but that none of these impairments met or equaled a listed impairment. R. at 22-23. The ALJ accorded Dr. Sabonya's opinions on Yarrington's inability to attend work little weight because they conflicted with the Doctor's notes on Yarrington's treatment. R. at 28-29. He accorded greater weight to the opinions of the state agency psychologists who examined Yarrington's records and offered consulting opinions on a disability determination. R. at 29. Also, he discounted Yarrington's own credibility regarding her description of the impact her migraines had on her ability to work, relying on conflicts between her treatment records and her testimony. R. at 27. The ALJ determined that Yarrington had the Residual Functional Capacity ("RFC") to do work limited to "simple, routine, low stress (low stress being defined as work with minimum changes in the work routine and that avoids fast paced work such as assembly line jobs involving production quotas) tasks." R. at 25. He also determined she could do work involving only "brief superficial interaction with the public, co-workers, and supervisors." R. at 26. The ALJ relied on the VE's testimony identifying jobs consistent with Yarrington's RFC to determine that Yarrington was capable of performing jobs that existed in significant numbers in the national economy. R. at 30. As a result, the ALJ held Yarrington had not been under a disability for the alleged period of disability. R. at 30-31.

### III.   STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed.  Perales, 402 U.S. at 390; Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017).  Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law.  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### IV.   ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under

age sixty-five, file an application for disability insurance benefits, and be under a "disability" as defined in the Act. 42 U.S.C. §§ 416(i), 423. The Social Security Regulations define "disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, a claimant must have a "severe impairment" that makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

(1)     Is the individual involved in substantial gainful activity?

(2)     Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

(3)     Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

(4)     Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

(5)     Does the individual's impairment or impairments prevent him or her from doing any other work?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. See id. §§ 404.1520, 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Lewis, 858 F.3d at 861 (citing Monroe v. Colvin, 826 F.3d 176, 179-80 (4th Cir. 2016)). When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

In this case, after conducting the analysis, the ALJ concluded that Yarrington met the insured status requirements from her alleged disability onset date, April 27, 2012, through her date last insured, March 31, 2014, but had not been under a disability within the meaning of the Social Security Act between the alleged disability onset date and the date of the hearing. See R. at 20, 22, 30-31.

At step one, the ALJ found Yarrington had not engaged in substantial gainful activity between April 27, 2012, the alleged onset date, and the day of the hearing. R. at 22. At step two, the ALJ found that Yarrington suffered from the following severe impairments: "major depression, bipolar disorder, anxiety-related disorder, personality disorder, obesity, migraines, asthma, lumbar disc disease, lumbar spondylosis, facet arthropathy, irritable bowel syndrome, and chronic pain syndrome." R. at 22 (citing 20 C.F.R. 404.1520(c), 416.920(c)). At step three, the ALJ found that Yarrington did not suffer from a listed impairment or combination of

impairments that met the severity of one of the listed impairments.  R. at 23.  At step four, the

ALJ found that Yarrington could not perform her past work.  R. at 29 (citing 20 C.F.R.

§§ 404.1565, 416.965.  The ALJ then crafted an extensively limited RFC designed to

accommodate Yarrington's several impairments.  Specifically, he found she had:

> the residual functional capacity to perform less than a full range of sedentary
> work as defined in 20 C.F.R. § 404.1567(a) and § 416.967(a).  The claimant is
> limited to lifting and carrying from waist to chest level.  The claimant can walk no
> longer than one block at a time, stand no longer than 10-15 minutes at a time
> before sitting and sit no longer than 30 minutes at a time before standing.  The
> claimant has to avoid crawling, kneeling, and climbing of ropes, ladders, and
> scaffolds, but she can perform other postural movements on an occasional basis.
> The claimant is limited to simple, routine, low stress (low stress defined as work
> with minimum changes in the work routine and that avoids fast paced work such
> as assembly line jobs involving production quotas) tasks.  The claimant is also
> limited to brief superficial interaction with the public, coworkers, and supervisors.
> The claimant has to avoid constant grasping, handling, fingering, and reaching.
> The claimant has to avoid working around hazards such as moving dangerous
> machinery [and] unprotected heights.  The claimant has to avoid concentrated
> exposure to respiratory irritants and extreme temperatures and humidity.  The
> claimant's work environment needs to have close proximity to a restroom such as
> in an office setting on the same floor.

R. at 25-26.  At step five, relying on the testimony of the VE after presenting her with this RFC

in hypothetical form, the ALJ concluded that jobs exist in significant numbers in the national

economy which Yarrington could perform.  R. at 29-30.  Consequently, the ALJ determined

Yarrington did not have a qualifying disability during the relevant period.  R. at 30-31.

    Yarrington now argues the ALJ erred in two ways.  First, she argues the ALJ failed to

properly weigh the medical opinion evidence of her mental impairments, specifically, the

opinion of her treating psychologist, Dr. Sabonya.  Pl.'s Mem. at 12 (ECF No. 11).  Second, she

argues the ALJ failed to properly evaluate her credibility.  Id. at 20.  Although Yarrington does

not say so directly, the court infers from her Memorandum (ECF No. 11) the suggestion that, had

the ALJ resolved either of these issues differently, he would have found her more limited and the

resultant RFC would lead to a finding that she was disabled.

As explained below, the ALJ did not err with respect to either of the issues Yarrington urges on the court.  Accordingly, there was no error in the ALJ's RFC determination requiring remand.

a.    The ALJ Relied on Substantial Evidence When Giving Weight to Conflicting Medical Opinion Evidence.

Yarrington first argues the ALJ failed to properly explain why he discounted the opinion of her treating psychiatrist, Dr. Sabonya, that Yarrington had "marked" limitations in concentration, persistence, and pace which would keep her off task at work and require frequent absences. Pl.'s Mem. at 12-18 (ECF No. 11).

When the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments, that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered.  20 C.F.R. §§ 404.1512, 404.1527, 416.912, 416.927. When the record contains a number of medical opinions from different sources that are consistent with each other, the ALJ is required to use that evidence to make a determination on disability.  20 C.F.R. §§ 404.1527(c), 416.927(c).  If, however, the medical opinions are inconsistent with each other or other evidence, the ALJ must evaluate the opinions and assign them persuasive weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (d), 416.927(c)(2)-(6), (d).

Ordinarily, a treating source's opinion will be given controlling weight if it is well-supported by medically acceptable diagnostic methodology and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Lewis, 858 F. 3d at 867; Craig, 76 F.3d at 590; SSR 96-2P, 1996 WL 374188 (July 2, 1996).  But, the ALJ need

not accept opinions from a treating source in every situation.  For instance, when the source opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence, or when it is not otherwise well-supported it is due no special deference.  §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d); Craig, 76 F.3d at 590 ("[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").  Courts generally should not disturb an ALJ's decision as to the weight afforded a medical opinion absent some indication that the ALJ "dredged up 'specious inconsistences.'"  Dunn v. Colvin, 607 F. App'x 264, 267 (4th Cir. 2015) (citing Scivally v. Sullivan, 966 F.2d 1070, 1077 (7th Cir. 1992)).  Indeed, an ALJ's decision regarding weight afforded a medical opinion should be left untouched unless the ALJ failed to give a sufficient reason for the weight afforded.[1]  See Lewis, 858 F. 3d at 868; Dunn, 607 F. App'x at 267.  Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]."  SSR 96-2P at *5.

    The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating source; and, (6) any other relevant factors.  20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically empower the ALJ—not the treating source—with

---

[1] The requirement to explain decisions regarding the weight accorded to medical evidence is not limited to evidence from treating physicians: in general, the ALJ must explain the reason she gave weight to any opinion before her.  20 C.F.R. § 404.1527(f)(2)(ii).

the authority to determine whether a claimant is disabled under the Act.   20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

Yarrington contends that the ALJ erred by improperly considering and evaluating the medical source statements submitted by her treating psychiatrist, Dr. Sabonya.  She also argues the ALJ assigned too much weight to the opinion evidence from state agency consultative psychologists who reviewed her medical records and concluded she was only mildly limited.

In this case, the ALJ specifically assigned little weight to certain opinions of Dr. Sabonya, a treating physician.  The ALJ gave as his reason for this the fact that Dr. Sabonya's conclusion in a "Mental Impairment Questionnaire" that Yarrington had marked limitations in understanding, remembering, and carrying out instructions "is not supported by her progress notes."  R. at 28-29.  Yarrington claims this assessment is insufficient under the rules and not supported by the evidentiary record.  The court disagrees.

To begin with, the ALJ carefully reviewed all the medical evidence, including the evidence of Dr. Sabonya's treatment.  The only opinion which he specifically discounted does not appear in those medical records, but in a "Questionnaire" Dr. Sabonya completed at the request of Yarrington's attorney solely to assist with her claim for disability.  Such check-the-box forms without any medical explanation or justification are not entitled to great weight, even when completed by a treating physician. Leonard v. Astrue, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)).  It was therefore not error requiring remand for the ALJ to discount the weight he gave to the document.  However, even if the "Questionnaire" is proper medical evidence, the ALJ's decision to afford it little weight was supported by substantial evidence.

In support of her argument for remand, Yarrington relies on the boxes Dr. Sabonya

checked on the "Questionnaire" suggesting she was "markedly" limited in concentration, persistence, and pace, and that she would miss more than three days per month due to her condition.  She claims the following conditions and symptoms support these restrictions: depressed mood, persistent or generalized anxiety, feelings of guilt/worthlessness, irritability, obsessions/worry, easy distractibility, recurrent panic attacks, anhedonia/pervasive loss of interests, appetite disturbances/weight change, decreased energy, deeply ingrained/maladaptive patterns of behavior, motor tension, social withdrawal or isolation, and difficulty falling asleep and staying asleep.  Pl.'s Mem. at 14 (ECF No. 11) (citing R. at 1060, 1174).  Yarrington further identifies a number of observations in Dr. Sabonya's treatment notes that are consistent with the "signs and symptoms" the psychiatrist identified on the form: Dr. Sabonya noted Yarrington to have anxiety with panic and depressed mood, R. at 572 (April 2012); an irritable, angry and labile mood, R. at 1031 (April 2014); an irritable mood, R. at 1030 (June 2014); sleep disturbance and an anxious mood, R. at 1028 (November 2014); an anxious, agitated, irritable, and labile mood, intrusive thoughts/worries, and difficulty sleeping, R. at 1065 (April 2015); and impaired judgment, an anxious, depressed, and labile mood with congruent affect, and abnormal sleep, R. at 1179 (December 2015).

But these citations to the record do not contradict the ALJ's decision to give limited weight to the very specific opinions Yarrington purports to rely on.  Notwithstanding the support Yarrington identifies for her position from Dr. Sabonya's records, in those same notes Dr. Sabonya also described her as having normal attention, normal judgment, no delusions, no hallucinations, no obsessions or compulsions, and no suicidal or homicidal thoughts.  R. at 572, 1028, 1030, 1034, 1048.  That Yarrington's depression and anxiety responded favorably to medication also contradicts Dr. Sabonya's opinion that Yarrington was incapable of working.

See R. at 1178.  The ALJ specifically noted that Dr. Sabonya concluded her mental condition was "stable with medication." R. at 28.  Because the ALJ properly relied on conflicting evidence in Dr. Sabonya's own treatment records, he was not required to give her check-the-box opinions regarding Yarrington's ability to consistently attend work controlling weight.  See Craig, 76 F.3d at 590.  He had the option to do so, but the responsibility to resolve the conflicts was committed to his judgment, not this court's.  Dunn, 607 F. App'x at 267.  It bears mention as well that the ALJ's RFC contained extensive non-exertional limitations to accommodate Yarrington's mental condition.  The ALJ restricted her to non-production work involving only simple tasks and limited superficial contact with co-workers, supervisors, and the general public.  All of these restrictions account for the other limitations found by Dr. Sabonya and relied upon as evidence in support of her opinions in Claimant's brief.

Yarrington also argues the ALJ gave undue weight to the state agency consultative psychologists' opinions.  R. at 16-18.  Although the ALJ only gave "significant to moderate" weight to the opinion of the state experts that Yarrington had moderate limitations in concentration, persistence, and pace, and even less weight to their opinion that she had mild limitations in social functioning, R. at 29, Yarrington still argues the ALJ should not have relied on the consultative psychologists even to this limited extent as neither of them had examined or treated her, and their record reviews pre-dated Dr. Sabonya's later evaluations.  Pl.'s Mem. at 16 (ECF No. 11).

State agency medical consultants are highly qualified physicians who are experts in Social Security disability evaluation.  20 C.F.R. §§ 404.1513a(b)(1), 416.913a(b)(1).  Therefore, when considering the opinion of a State Agency medical consultant, the ALJ must evaluate those findings just as he would for any other medical opinion.  20 C.F.R. §§ 404.1513a(b)(1),

416.913a(b)(1). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ is required to explain the weight given to State Agency opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e); see 20 C.F.R. §§ 404.1513a, 416.913a. Although consulting physician's opinions cannot serve as a basis for denying benefits when contradicted by all of the other evidence in the record, they can be used as a basis for a determination of no disability if supported by other evidence before the ALJ. See Smith v. Schweiker, 795 F.2d 343, 348 (4th Cir. 1986).

As described above, there was significant evidence over the course of several years that Yarrington had responded well to her mental health medications. These records were consistent with the consultative psychologists' opinions, so it was not inappropriate for the ALJ to weigh the consultative experts' opinions more heavily than certain specific answers Dr. Sabonya made on the "Questionnaire." The ALJ's opinion carefully considered the entire range of medical evidence. In fact, he gave little weight to the consultant's opinions that Yarrington was only mildly limited in social functioning as the records of her treatment supported the more moderate limitations which are encompassed in her RFC. In short, there were conflicts in the evidence before the ALJ, requiring him to evaluate the credibility of the source of each piece of evidence. From the record, he did exactly that. Because the ALJ's decision to give little weight to certain opinions of Yarrington's treating physician and more weight to the state agency consultative psychologists was supported by substantial evidence, those decisions do not warrant remand.

b.      The ALJ Relied on Substantial Evidence When Evaluating Yarrington's Credibility.

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f), 404.1545(a)(1), 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's

subjective symptoms, the ALJ must follow a two-step analysis. Craig, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186 (July 2, 1996).   The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. Id.; SSR 96-7p at 1-3.  The ALJ must consider all the medical evidence in the record. Craig, 76 F.3d at 594-95; SSR 96-7p at *5 n. 3; see also SSR 96-8p, 1996 WL 374184, at *13 (July 2, 1996) (the "RFC assessment must be based on all of the relevant evidence in the case record") (emphasis added).  If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work.  Craig, 76 F.3d at 595.  The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. Craig, 76 F.3d 595-96; SSR 96-7p, at *5-6, 11.

In evaluating the evidence in an appeal of a denial of benefits, the court does "not conduct a blank slate review of the evidence, Smith, 795 F.2d 343, 345 (4th Cir. 1986), or undertake to reweigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Hancock, 667 F.3d at 472.  Rather, "[t]he duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court." Smith, 99 F.3d at 638.  When conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ.  Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005) (per curiam).

The ALJ determined Yarrington's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements regarding the intensity, persistence, and limiting effects were not credible. R. at 27. Specifically, the ALJ found that, although she did experience migraines and musculoskeletal pain, these symptoms were "reasonably well-controlled with conservative treatment and medication." Id. Records from her visits to the emergency room and other providers support this conclusion. See, e.g., R. at 1106-1109 (emergency room staff notes: " when comes to the [emergency room] usually gets dilaudid[2] and does not completely resolve her symptoms but gets it under control enough so she can be treated at home with her medications"). Additionally, the evidence before the ALJ reflects no treatment for her migraines after 2013. In addition to the evidence in her treatment record that conflicts with her statements describing her functional limitations, her chiropractor, Dr. Lawrence Svihla, stated in his evaluation of her the opinion that she was a malingerer. R. at 1096; see generally R. at 1076-98 (Yarrington's treatment records from Svihla). Although the ALJ properly discounted Svihla's opinions regarding Yarrington's specific functional limitations as inconsistent with physical examination, and because a chiropractor is not a "medical source" within the definitions of the Social Security Regulations, the ALJ also observed that Dr. Svihla's assessment of her disability status overall was "consistent with the objective medical evidence and claimant's extensive daily activities." R. at 29 (citing R. at 1076-78). As discussed above, so long as the ALJ's decision in assessing a claimant's credibility is supported by substantial evidence, this court does not undertake to re-weigh the evidence. Because the ALJ's decision to discount Yarrington's testimony regarding the impact of her conditions on her ability to work was supported by substantial evidence, that decision does not warrant remand.

---

[2] Dilaudid, a brand name for hydromorphone, is a prescription pain medication. Hydromorphone, Mayo Clinic (Mar. 1, 2017), https://www.mayoclinic.org/drugs-supplements/hydromorphone-oral-route/description/drg-20074171.

## V.   **RECOMMENDATION**

For the foregoing reasons, the undersigned recommends that the court GRANT the Commissioner's Motion for Summary Judgment (ECF No. 12), DENY Yarrington's Motions for Summary Judgment and for Remand (ECF Nos. 9, 10), and AFFIRM the final decision of the Commissioner.

## VI.   **REVIEW PROCEDURE**

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.     Any party may serve upon the other party and file written objections to the foregoing findings and recommendations within fourteen days from the date of service of this Report on the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

2.     A district judge shall make a <u>de novo</u> determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 26, 2018

21